IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND C. WAGONER, | ) | CASE NO. 5:11CV00239 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Raymond C. Wagoner ("Wagoner") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be AFFIRMED.

## I.  Procedural History

Wagoner filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") on November 6, 2006[1] alleging disability beginning on August 31, 2003.  Tr. 128-137.   Wagoner alleged disability due to problems related to his back, neck, right knee, hips, right arm, heart, Barrett's disease, and depression.  Tr. 96, 99, 106, 110, 113, 117.  After initial denials by the state agency (Tr. 95-101, 106-119), Wagoner requested a

---

[1] Plaintiff and Defendant both assert that Wagoner filed his applications on November 5, 2006.  Doc. 14 at 1; Doc. 15 at 1.  However, the record supports the ALJ's finding that Wagoner's applications were filed on November 6, 2006.  Tr. 79,128-137.

hearing (Tr.120), and an administrative hearing was held before Administrative Law Judge Carol

A. Baumerich ("ALJ") on May 1, 2009.  Tr. 10-71.

In a decision dated October 30, 2009, the ALJ determined that Wagoner had not been

under a disability from August 31, 2003, through the date of the decision.  Tr. 76-94.  Wagoner

requested review of the ALJ's decision by the Appeals Council on November 3, 2009. Tr. 8-9.

On December 14, 2010, the Appeals Council denied Wagoner's request for review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.     Personal and Vocational Evidence

Wagoner was born on April 11, 1972.  Tr.  128 and 134.  Wagoner and his wife have four

children.  Tr. 42-44.  At the time of the hearing, Wagoner's children were 13, 10, 7 and 2.  Tr.

44.  Wagoner attended Kent State through the Spring of 2008,[2] but did not graduate. Tr.  19-20.

While attending Kent State, Wagoner was a full-time student seeking a degree in criminal

justice.  Tr. 20, 475.  Wagoner's last employment, not including his college internships, was in

2003 as a security manager at Food for Less.  Tr. 18, 23.  While working as a security manager,

Wagoner had the authority to discipline and fire people.  Tr. 23.  He mostly sat while at work but

did have to also take action to apprehend individuals.  Tr.  23.  Also, while not specifically

related to his security position, at times he was required to assist with stocking shelves at Food

for Less.  Tr. 23.  This required him to lift bags of bulk food weighing about 75-80 pounds.  Tr.

23.  Wagoner also worked as a paramedic/EMT.  Tr. 24.  While in college, Wagoner had two

internships at the Jackson police department. Tr. 21-22.  Each internship was for a total of 120

hours or two credit hours.  Tr. 21-22.

---

[2] Wagoner testified that, in the Fall of 2008, he tried to attend classes but he was only able to attend classes for two weeks due to the fact that he could not handle the pressure.  Tr. 19.

**B.     Medical Evidence**

    **1.     Psychological**

        **a.     Treating Physician and Medical Providers**

            **i.     <u>Nkangmine Ike M.D.</u>**

Dr. Nkangmine Ike ("Ike") began treating Wagoner on January 1, 2007 and continued through 2009.  Tr. 83, 529, 614, 663-665, 682.  On April 3, 2007, at the request of the SSA, Ike submitted a report concerning Wagoner's mental condition.  Tr. 528-530.  Ike diagnosed Wagoner with mood disorder and panic disorder.  Tr. 529.  Ike though also opined that Wagoner was stable.  Tr. 530.  Ike indicated that Wagoner has the following limitations on his ability to perform sustained work activity: history "of thoughts are suppressed feelings, rage and periods of explosiveness."  Tr. 530.

Ike's treatment notes from 2008 and 2009 demonstrate that Wagoner was remaining stable.  Tr. 614, 663-665, 682.  On April 25, 2008, Wagoner reported feeling that he was "doing better than when he began" treatment.  Tr. 614.  On September 25, 2008, the treatment notes indicate that Wagoner was not happy but also indicate that he was fairly stable and that his insight and judgment were adequate.  Tr. 665.  Less than two months later, on November 7, 2008, treatment notes indicate that Wagoner was fairly happy, rather than not happy, and also indicate that Wagoner was fairly stable and his insight and judgment were adequate.  Tr. 663. January 9, 2009, notes indicate that Wagoner reported that there was nothing for him to be depressed about and, March 25, 2009, treatment notes again indicate that Wagoner was fairly happy and his insight and judgment were adequate.  Tr. 664. 682.

### ii.        **Norman Drively**

On April 2, 2007, Therapist Norman Drively ("Drively") completed a Medical Source Statement of Wagoner's ability to do work-related activities.  Tr. 524-526.  Wagoner testified that Drively treated Wagoner for only a couple of months.  Tr. 54.  Drively opined that Wagoner had no impairment in his ability to understand and remember short, simple instructions; to carry out short, simple instructions; or to make judgments on simple work-related decisions.  Drively further opined that Wagoner had moderate to marked impairments in his ability to understand and remember detailed instructions and carry out detailed instructions; moderate impairments in his ability to interact appropriately with the public, supervisors and co-workers; and marked impairments in his ability to respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting.  Tr. 524-525.  Drively also opined that Wagoner's anxiety and depression may cause difficulty in Wagoner's ability to work consistently.  Tr. 525.

### b.        **Consultative Examining Physician**

On January 10, 2007, Psychologist Robert F. Dallara, Jr. Ph.D. ("Dallara"), completed a psychological examination of Wagoner.  Tr. 416-419.  Dallara diagnosed Wagoner with Major Depression and a GAF of 55[3].  Tr. 419.   Regarding Wagoner's work related mental abilities, Dallara opined that:

    - Wagoner's ability to relate to others, including fellow workers and supervisors
      was slightly impaired as a result of his depression.

----

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

- Wagoner's ability to understand, remember and follow instructions was adequate.  Wagoner did not demonstrate significant difficulties with comprehension or memory.

- Wagoner's ability to maintain attention and concentration was adequate, and there was no direct evidence during the examination to suggest impaired persistence or pace.

- Wagoner's ability to withstand stress and pressure associated with day-to-day work activity was moderately impaired as a result of his depression.

- Wagoner would be capable of managing his own funds.

Tr. 419.

### c.        Agency Reviewing Physician

On January 24, 2007, state agency reviewing physician Caroline Lewin, Ph. D. ("Lewin") completed a Psychiatric Review Technique. Tr. 421-434.  Lewin opined that Wagoner did have Major Depression but further opined that said impairment was not severe.  Tr. 421, 424.  Lewin opined that Wagoner had mild restrictions in activities of daily living and maintaining social functioning; no restrictions in maintaining concentration, persistence and pace; and no episodes of decompensation of extended duration.  Tr. 431.  Lewin reviewed Dallara's report and did not adopt Dallara's opinion that Wagoner's ability to handle stress and pressures associated with day to day work activity was moderately impaired.  Tr. 433.  Lewin disagreed with these limitations because Wagoner had no problems with attention, concentration and persistence; no problems with understanding, remembering and following directions; and had only mild impairments in social interaction.  Tr. 433.  Lewin ultimately opined that Wagoner's mental health did not cause limitations in his work activity.  Tr. 433.

### 2.        Physical

#### a.        Treating Physicians

##### i.        <u>Robert M. Felden, D.O.</u>

Robert M. Felden, D.O. ("Felden") treated Wagoner for pain management at the Aultman Center for Pain Management[4] ("Aultman") during 2006 through 2008.[5]  Tr. 455-477, 559-566, 610, 637-638, 609-612.  During visits at Aultman, Wagoner reported unbearable pain at times. Tr. 455-477, 559-566, 612.  By early 2007, Felden had administered a series of lumbar epidural steroid injections.  Tr. 457.  During a visit with Felden on January 12, 2007, Wagoner requested a statement from Felden that it was medically necessary for Wagoner to withdraw from college. Tr. 459.  Felden declined to issue the requested statement and advised Wagoner that a functional capacity examination would be required and Wagoner would have to follow up with his primary care physician.  Tr. 459.

Felden did not offer a specific opinion regarding what if any limitations resulted from Wagoner's back pain.  However, as more fully described below, treatment notes do include references to Felden's advice regarding the level of activity that Wagoner should be engaged in. On May 1, 2007, Felden noted that he again encouraged Wagoner to engage in activity.  Tr. 565. During an August 2007 visit, Wagoner's wife indicated that she had been encouraging Wagoner to remain active, but at times Wagoner reported that doing so was unbearable.  Tr. 563.  The plan following this August 2007 visit was that Wagoner should increase activity as tolerated.  Tr. 564.  Felden advised Wagoner that although "his pain may exacerbate after activity," he should remain active "because this will build up his endurance and diminish pain with time."  Tr. 564. At an October 10, 2007, office visit, Wagoner was again advised to remain as active as possible and to continue pool therapy.  Tr. 562.  Also on October 1, 2007, Wagoner was advised to follow up with Dr. Tabet regarding Wagoner's desire for an opinion regarding back surgery.  Tr. 561-

---

[4] Dr. Soni referred Wagoner to Aultman.  Tr. 474.  In his March 2, 2006, initial consultation notes, Feldman indicated that there was some confusion as to what was actually being requested by Dr. Soni.  Tr. 477.

[5] Treatment notes indicate that, on October 1, 2007, Atef Wasef, M.D. treated Wagoner at Aultman.  Tr. 561-562. Also, on October 22, 2008, Amgad Labib Takla, M.D. treated Wagoner at Aultman.  Tr. 638.

562.  On January 1, 2008, activity as tolerated was encouraged along with stretching and range

of motion exercises.  Tr. 560, 611.   On August 8, 2008, Wagoner reported feeling worse than he

had in the past.  Tr. 612.  Yet, one month later, on September 24, 2008, Wagoner reported that

Percocet was helping his back pain.  Tr. 637.  Then again, another month later, on October 22,

2008, Wagoner reported that "the pain has been very well managed with the Percocet."  Tr. 638.

At that October visit, Wagoner also reported that overall he was "remaining fairly active and

does continue to care for his child at home, and . . . any kind of activity aggravates his pain, but

he tries to keep busy."  Tr. 638.

### ii.     P.L. Soni, M.D.

P.L. Soni, M.D. ("Soni") began treating Wagoner in 2004 for pain.  Tr. 474.  Treatment

notes reflect treatment by Soni through 2006.  Tr. 355-361, 403-408.  At his visit on March 31,

2004, Wagoner reported having neck and low back pain following a 2000 accident.  Tr. 356.

Soni administered facet blocks to the L5-S1 facet joint on the right and to the neck.  Tr. 356.

Follow up visits continued during 2004 and 2005.  Tr. 355-358.

On November 21, 2005, Soni saw Wagoner again following a motor vehicle accident.

Tr. 358.  Wagoner reported severe pain in his lower back, neck and right side of his chest.  Tr.

358.  Soni administered trigger point injections in the neck and lower back, advised Wagoner to

use the pain cream and take pain medication, and referred Wagoner to Dr. Pinghero's office for

therapy.  Tr. 358.

On January 16, 2006, Soni reported that a cervical MRI showed a disk herniation at the

C5-6 level.  Tr. 359.  However, the impressions noted on the January 16, 2006, cervical MRI

relative to the C5-6 level were discogenic spondylolsis with posterior spurring towards the right

with compression of the thecal sac and the right C6 nerve root sleeve and mild to moderate

neural canal stenosis.  Tr. 226-227.  At the January 16, 2006, visit, Wagoner reported lower back and right leg pain.  Tr. 359.  To rule out a herniation of the lumbar spine, Soni recommended an MRI of the lumbar spine.  Tr. 359.

On January 31, 2006, Soni indicated that a lumbar MRI had been obtained and that the MRI showed a herniated disk at L4-5 and L5-S1.  Tr. 360.  However, the impressions noted on the January 16, 2006, lumbar MRI were asymmetric bulging of the L5-S1, diffuse bulging of the L4-5 disc and mild to moderate disc degeneration at L4-5 and L5-S1 levels.  Tr. 222-224.  Moreover, notwithstanding Soni's opinion that there was a herniated disc, during the January 31, 2006, visit, Soni gave Wagoner a prescription to go to the Hall of Fame Fitness Center for one month and advised him to use the sauna and other facilities.  Tr. 360.

On February 7, 2006, Wagoner was feeling much better and the pain was much less.  Tr. 360.  On March 8, 2006, based in part on Wagoner's wife's idea, Soni recommended that Wagoner begin treatment at Aultman. Tr. 360.  On June 21, 2006, although Wagoner still reported pain, Soni discharged Wagoner from his care noting that it was his opinion that there was no further treatment that he could do for Wagoner and that it was his opinion that Wagoner had sustained a cervical strain, lumbar strain, and a herniated cervical disk with right arm pain as a result of the November 15, 2005, accident.  Tr. 361.  Soni also indicated that maintenance care would be required for approximately the next two to three years but he did not believe that surgery would be required.  Tr. 361.

### b.    Agency Reviewing Physician

On January 24, 2007, state agency reviewing physician Anton Freihofner, M.D. ("Freihofner") completed a Physical Residual Functional Capacity Assessment.  Tr. 435-442.

Freihofner opined that Wagoner was capable of light work[6] with the following limitations: no climbing of ladders, ropes or scaffolding; limited reaching in all directions; and avoidance of fumes, odors, gases, poor ventilation, etc.  Tr. 437-439.

### c.    Other Physicians and Medical Providers

### i.    J.C. Tabet, M.D.

Based on a referral by Wagoner's pain management doctor, neurological surgeon J.C. Tabet, M.D. ("Tabet") examined Wagoner on November 15, 2007.  Tr. 580-582.  In his report to Dr. Felden, Tabet opined that Wagoner did have a disc herniation off to the left side,[7] but indicated that the herniation did not correlate with most or any of Wagoner's significant symptoms.  Tr. 580.  Tabet therefore did not recommend surgery but indicated that a more recent MRI and EMG and nerve conduction study may be warranted.  Tr. 580.

An MRI and x-rays were completed on December 21, 2007.  Tr. 577-579.  On January 9, 2008, a nerve conduction study/EMG was performed. Tr. 574-576.  On January 10, 2008, Tabet reported that the EMG and nerve conduction study was normal and that the lumbar spine x-rays with lateral flexion extension films were unremarkable.  Tr. 573.  Tabet also reported that the MRI showed degenerative disc disease and a left sided L5 disc bulge that herniates towards the left side, but did not think that it was responsible for most of Wagoner's symptoms.  Tr. 573.  He did not recommend surgery and indicated that the next test, if Wagoner was interested, would be a myelogram and postmyelogram.  Tr. 573.

On January 31, 2008, a postmyelogram CT lumbar spine and lumbar myelogram were performed.  Tr. 569-572.  In reviewing the results of these tests, Tabet indicated that the tests

---

[6] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing 10 pounds with a good deal of walking or standing.  20 C.F.R. §§ 404.1567(b).

[7] Tabet's assessment regarding a disc herniation was based on a May 15, 2007, MRI.  Tr. 581.

show truly minor changes which are not likely to be responsible for Wagoner's then current back or leg pain.  Tr. 568.  Tabet did note that like the MRI, the myelogram and postmyelogram CT scan were more abnormal on the contralateral left side, but that abnormality was "quite subtle."  Tr. 568.  Tabet again declined to recommend surgery.  Tr. 568.

### ii.    **Marykay Barnes M. Ed., CRC, OTR/L**

On March 6, 2007, occupational therapist Marykay Barnes ("Barnes") completed a Physical Work Performance Evaluation Summary ("PWPE Summary") and submitted the PWPE Summary to Dr. Felden.   Tr. 532-539.  The sections tested with the evaluation were Dynamic Strength, Position Tolerance, Mobility and Endurance.  Tr. 532.  Barnes opined that, based on the results of the evaluation, Wagoner was capable of performing physical work at the sedentary level for only three hours per day, with rest breaks and the ability to change positions.  Tr. 532.  Barnes noted that Wagoner participated fully in 20 out of 24 tasks, but demonstrated self-limiting participation[8] by stopping on 4 out of 24 tasks.[9]  Tr. 532.  Barnes reported that Wagoner self-limited in the repetitive squat task, standing and sitting trunk rotation tasks, and bilateral carry tasks.  Tr. 533.  Wagoner's reported reason for self-limiting participation was pain.  Tr. 533.

### C.    **Testimonial Evidence**

### 1.    **Wagoner's Testimony**

Wagoner testified regarding his work history as a security manager and EMT, his attendance at Kent State and internships during his enrollment at Kent State, his day-to-day activities, and his use of a cane and scooter.  Tr. 18-25, 41-55.  Wagoner was pursuing a degree

---

[8] As described on the PWPE Summary, self-limiting participation means that the client stopped the task before specific physical signs of a safe maximal effort were observed, i.e., what the client was willing to do rather than a safe maximum physical effort.  Tr. 533.

[9] The PWPE Summary indicates that, if a client self-limits on 4 or fewer tasks in dynamic, position tolerance and mobility sections, overall participation is considered good and does not warrant further evaluation.  Tr. 533.

in criminal justice at Kent State but stopped attending in 2008 because he could not handle the pressure.  Tr. 19.  While at Kent State, he participated in two internships with the Jackson police department.  Tr. 20-22.  The internships involved riding along with officers that were on duty and observing dispatch.  Tr. 20-22.  If authorized by the officer, Wagoner was able to get out of the police car to observe during police stops.  Tr. 22.  Wagoner purchased a motorized scooter and used a cane to assist him with getting around both at home and while out.  Tr. 52-54.  He testified that the pain management clinic advised him to use the cane.  Tr. 53.  Wagoner began using the cane more regularly in 2007.  Tr. 53.

At home, Wagoner testified that his wife takes care of most of the household chores and assisting their children.  Tr. 41-47.  Wagoner stated that he was unable to care for his infant son once he was about 4 or 5 months old because he became too heavy so they enrolled him in daycare. Tr. 41-42.  Wagoner occasionally assists his children with their homework, but he testified that his wife generally gets their children ready for school.  Tr. 44.  He can fold a little laundry if his wife brings him the basket but his hands go numb.  Tr. 46-47.  He testified that he really enjoys cooking and used to cook a lot more.  Although he  but cannot do as much anymore, he does still cook occasionally.  Tr. 47-48.  Wagoner also used to assist with paying the bills but, since 2008, he had not done the bills because it was too stressful for him due to financial issues.  Tr. 45-48.  Wagoner's normal day consists of sitting on the couch, walking around a bit if he cannot sit, taking a warm shower, playing video games, lying down, sitting outside with his children and watching them play, and going to the doctors. Tr. 44-45.

### 2.    Medical Expert's Testimony

Medical Expert Dr. Malcolm Brahms ("Brahms") testified at the hearing regarding Wagoner's physical impairments.  Tr. 25-41.  His testimony was limited to the orthopedic

aspects of Wagoner's physical impairments.[10]  Tr. 26.  He opined that Wagoner's impairments did not meet or equal a Listing.  Tr. 17.  Further, Brahms opined that Wagoner is "certainly capable of light duty," and testified that Wagoner's exertional level was medium.  Tr. 27-28.  Brahms opined Wagoner did not require functional restrictions.  Tr. 27-28.  Brahms specifically disagreed with a state agency reviewing physician's opinion that overhead reaching should be limited to occasional because of degeneration at C6-7.  Tr. 28.  Brahms testified that the medical record did not support Wagoner's complaints of numbness in his upper extremities or the need for a cane.  Tr. 29.  Brahms opined that Wagoner could lift greater than twenty pounds and therefore limitations regarding lifting were unnecessary.  Tr. 30.  Brahms differentiated between spasms and tenderness by stating that a spasm is an acute onset of a muscle contraction that lasts for a short period of time whereas tenderness is a subjective symptom that is indicative of some muscle trauma or muscle pain.  Tr. 30-31  He further testified that complaints of spasms and tenderness are consistent with someone having back pain.  Tr. 30-31.  Brahms opined, however, that objective medical evidence does not support Wagoner's subjective complaints of pain.  Tr. 31-32.

When questioned by Wagoner's counsel regarding a possible herniated disc, Brahms was insistent that the MRI reports do not support or show a herniated disc.  Tr. 35-41.  Brahms testified that what matters is what the MRI says about the disc, not what a treating physician says in his or her report.  Tr. 35.  Brahms testified that an MRI showing a disc bulge does not mean a thing because a bulge cannot cause any nerve root involvement.  Tr. 35-36.

---

[10] Brahms mentioned Wagoner's 2005 car accident injuries.  Tr. 28-29.  However, Brahms indicated that he was not offering an opinion as to whether Wagoner's condition worsened after that 2005 accident.  Tr. 28-29.

### 3.    Vocational Expert's Testimony

Vocational Expert Bruce Holderead ("VE") testified at the hearing.  Tr. 55-68.  The VE testified that Wagoner's past work at Food for Less as a manager, internal security is a skilled, light exertional level position as performed in the national economy.  Tr. 56.  The VE noted that the position as performed by Wagoner included stocking shelves and therefore was performed at the heavy exertional level.  Tr. 56.  The VE testified that Wagoner's past work as an emergency medical technician ("EMT") is a skilled, medium exertional level position as performed in the national economy but Wagoner performed the position at the very heavy exertional level.  Tr. 57. In response to a hypothetical consistent with the ALJ's RFC finding, the VE testified that Wagoner could perform his past work as a manager, internal security and EMT.  Tr. 57-58.  The VE clarified that it was his opinion that Wagoner could perform the EMT position as it is performed in the national economy, but not in the manner that Wagoner indicated he performed it.  Tr. 58.

The VE also testified that based on a hypothetical consistent with the ALJ's medium work level RFC, there are jobs, other than Wagoner's past relevant work, that such an individual could perform.  Tr. 59.  Specifically, the VE identified three jobs: line room attendant, dining room attendant and cleaner II.  Tr. 59.  All three jobs were identified as unskilled, medium exertional level.  Tr. 59.  The VE provided further testimony in response to a series of modified hypotheticals based on different exertional levels and with added restrictions.  Tr. 60-67.  Also, in response to questions by Wagoner's counsel, the VE testified that there would be no jobs available to a person who was limited to sedentary work for three hours per day, with rest breaks and the ability to change positions.  Tr. 67-68.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. *If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of*

14

performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[11]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her October 30, 2009 decision, the ALJ determined that:

1.  Wagoner met the insured status requirements through December 31, 2007.  Tr. 81.

2.  Wagoner had not engaged in substantial gainful activity since August 31, 2003.  Tr. 81.

3.  Wagoner had severe impairments of: Degenerative Disc Disease, Reactive Airway Disease, and Obesity. Tr. 81. Wagoner's medical impairments of Gastroesophageal Relux, Barrett's Esophagus, Mitral Regurgitation, Major Depression, and Panic Disorder were not severe impairments.  Tr. 81-82.

4.  Wagoner does not have an impairment or combination of impairments that meets or medically equals a Listing.[12]  Tr. 84.  In reaching this conclusion the ALJ indicated that she considered all of the Listings and, in particular, Listings 1.00(Q), 1.04, 3.02, 4.02, 5.00, 12.04 and 12.06.

5.  Wagoner had the Residual Functional Capacity ("RFC") to perform medium work with restrictions of never climbing ladders, ropes or scaffolds; avoiding

---

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

all exposure to unprotected heights; avoiding concentrated exposure to irritants such as fumes, odors, dust and gases. Tr. 84-92.

6. Wagoner was capable of performing past relevant work as a security guard ("manager, internal security") and emergency medical technician. Tr. 92. In reaching this conclusion, the ALJ acknowledged that, while Wagoner had performed his past work as manager, internal security, and emergency medical technician at the heavy exertional level, the jobs, according to the VE, were classified under the DOT[13] as light and medium exertional levels respectively. Tr. 92. Based on a review of Wagoner's RFC, the ALJ determined Wagoner could perform his past relevant work as it is generally performed. Tr. 92.

7. Although Wagoner was capable of performing his past relevant work, as an alternative finding under Step Five of the sequential evaluation process, Wagoner could perform other jobs existing in the national economy including linen room attendant, dining room attendant, and cleaner II. Tr. 92-93.

8. Wagoner had not been under a disability from August 31, 2003, through the date of the decision. Tr. 93-94.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

First, Wagoner argues that the ALJ erred in not finding Wagoner's mental impairment to be severe. Doc. 14 at 12, 14-15. Wagoner asserts that he suffers from a severe mental impairment, major depression. Doc. 14 at 14-15. Second, Wagoner argues that the ALJ erred by failing to give the opinions of Wagoner's treating therapist, Norman Drively, and his occupational therapist, Marykay Barnes, the correct weight. Doc. 14 at 12, 15-18. Third, Wagoner argues that the ALJ erred by finding him capable of medium work. Doc. 14 at 12, 18-19. Finally, Wagoner argues that the ALJ erred in deciding the case at Step Four of the sequential evaluation. Doc. 14 at 12, 19.

### B.    Defendant's Arguments

---

[13] Dictionary of Occupational Titles is published by the Department of Labor. *See* 20 CFR § 404.1566(d)(1).

First, the Commissioner argues that substantial evidence supports the ALJ's determination at Step Two that Wagoner did not have a severe mental impairment.  Doc. 15 at 1, 12-15.  Second, the Commissioner argues that substantial evidence supports the ALJ's determination that Wagoner had the RFC to perform a reduced range of medium work.  Doc. 15 at 1, 15-18.  Finally, the Commissioner argues that substantial evidence supports the ALJ's determination that Wagoner could perform his past relevant work as an internal security manager and EMT.  Doc. 15 at 1, 18-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence, or indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.** **The ALJ's finding that Wagoner's mental impairment was not severe was proper and is supported by substantial evidence.**

The ALJ properly evaluated Wagoner's mental impairments of major depression and panic disorder and applied the applicable Regulations when determining that his mental impairments were not severe.  Tr. 81-84.

The Commissioner's regulations state that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  If a claimant does not have any impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities, he will be determined not to have a severe impairment.  20 C.F.R. § 404.1520(c).  When referring to "basic work activities," the Commissioner means the abilities and aptitudes necessary to do most jobs.  20 C.F.R. § 404.1521(b).  Basic work activities include understanding, carrying out and remembering simple instructions; use of judgment; and responding appropriately to supervision, co-workers and usual work situations.  *Id.*  Additionally, when evaluating the severity of a mental impairment, the technique set forth in 20 C.F.R. § 404.1520a is to be applied.

As required by 20 C.F.R. § 404.1520a(c), the ALJ rated Wagoner's functional limitations in the four broad functional areas of activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  Tr. 82-84. To reach her findings regarding the degree of Wagoner's functional limitations relative to his mental impairments, the ALJ reviewed and assessed medical opinions from: Wagoner's treating physician Dr. Ike; Wagoner's therapist Norman Drively; consultative examining physician Dr. Dallara; and state agency reviewing physician Dr. Lewin.  Tr. 82-84.

Wagoner asserts that the ALJ did not give the appropriate weight to Drively's opinion. Doc. 15 at 15-17.  However, a review of the ALJ's discussion regarding the weight given to Drively demonstrates that the ALJ properly considered and evaluated Drively's opinion.  Tr. 83. The ALJ recognized and Wagoner does not dispute that Drively is not an acceptable medical source for establishing a medically determinable impairment.  *See* 20 C.F.R. § 404.1513(a); Doc. 15 at 15-16.  Further, the ALJ recognized that an acceptable medical source's opinion may be considered in assessing limitations and the ALJ did in fact consider Drively's opinion.  *See* 20 C.F.R. § 404.1513(d); SSR No. 06-03p, 2006 SSR LEXIS 5, * 5 (2006); Tr. 83.  When determining what weight to provide to Drively's opinion, the ALJ evaluated Drively's opinion in relationship to the other evidence.  Tr. 83.

While Drively opined that Wagoner exhibited moderate to marked limitations in certain areas of functioning, the ALJ gave more weight to Wagoner's longest treating psychiatrist, Dr. Ike, who, on April 3, 2007, a day after Drively issued his report, indicated that Wagoner was stable Tr. 83, 526, 528.  While Ike treated Wagoner for at least two years, Drively treated Wagoner for only a couple of months.  Tr. 54, 83, 529, 614, 663-665, 682.  Additionally, Ike's treatment records from 2008 show Wagoner was remaining stable and his insight and judgment were adequate.  Tr. 663-665.  Further, in January, 2009, Wagoner reported that there was nothing for him to be depressed about.  Tr. 682.  In addition to considering opinions of Wagoner's medical providers, the ALJ considered other evidence including Wagoner's full-time attendance at University, his daily living activities including his ability to take care of his own personal hygiene, his ability to help care for his infant son, and his ability to maintain attention and concentration during medical examinations when rating Wagoner's functional areas.  Tr. 82-84.

The evidence discussed herein that was relied upon by the ALJ is substantial evidence. Having relied upon such evidence, the ALJ found mild limitations in the areas of activities of daily living, social functioning and concentration, persistence or pace. Tr. 82. The ALJ also found that Wagoner had not experienced any episodes of decompensation. Tr. 82.

As noted by the ALJ, her ratings of the four functional areas led to a finding that Wagoner's mental impairments were non-severe. Tr. 82-83. Specifically, the Regulations provide that, if there are no or only mild limitations in the first three functional areas, i.e., activities of daily living, social functioning and concentration, persistence or pace, and no episodes of decompensation, the conclusion will generally be that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520a(d).

The ALJ's decision that Wagoner's mental impairments did not cause more than a minimal limitation in basic work activities and the ALJ's ratings of the four functional areas are both supported by substantial evidence and consistent with the Regulations.

**B.      The ALJ's finding that Wagoner had the RFC to perform a reduced range of medium work is proper and supported by substantial evidence.**

Wagoner argues that the ALJ's RFC of medium work was error because the ALJ did not provide any weight or did not provide proper weight to the PWPE report of his occupational therapist Marykay Barnes[14] and the ALJ misunderstood Barnes' discussion of Wagoner's self-limiting participation. Doc. 14 at 18-19. Wagoner also argues that the ALJ exclusively relied upon medical expert Brahms' opinion that Wagoner can perform medium work and that such reliance was misplaced because Brahms incorrectly concluded that Wagoner does not have a herniated disc. Doc. 14 at 17-18.

---

[14] At one point, Wagoner argues the ALJ provided *no weight* to Barnes, but also argues the ALJ failed to provide sufficient justifications for giving Ms. Barnes' opinion *limited weight*. Doc. 14 at 18-19.

The Regulations provide that the ALJ is responsible for assessing a claimant's RFC based on the relevant evidence.  20 C.F.R. §§ 404.1545; 404.1546(c).  Here, the ALJ conducted a thorough review of all the evidence and evaluated and weighed the opinions submitted in connection with Wagoner's disability claim.  Tr. 76-94.  Further, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  As noted by Wagoner, Brahms' conclusion was that Wagoner did not have a herniated disc.  Doc 14 at 17.  It was his opinion that the MRIs did not reveal a herniated disc notwithstanding that doctors reported otherwise.  Tr. 35, 37-38.  Further, it was his opinion that Wagoner was capable of medium work.  Tr. 27-28.  The ALJ agreed with Brahms' opinion and stated that Brahms' opinion is consistent with the evidence and supported by imaging showing mild pathology on a cervical MRI and lumbar myelogram.  Tr. 89-90.  The ALJ also noted Brahms' orthopedic expertise.  Tr. 90.  The ALJ's reliance on this opinion as support for her RFC findings cannot be said to be improper or misplaced nor was it the only evidence relied upon to support her RFC findings.  Tr. 84-92.

The ALJ did review and provide limited weight to Barnes' opinion.  Tr. 90. Barnes opined that Wagoner was limited to sedentary work for three hours per day, with rest breaks and the ability to change positions.  Tr. 90, 532.  The ALJ's decision to give this opinion limited weight was based in part on Barnes' notations that Wagoner exhibited self limiting behavior.  It was also based on the fact that Wagoner's own activities, including caring for his infant son, attending college during the summer of 2007, and participating in a police internship during that same period demonstrate greater functional ability than reported by Barnes.  Tr. 90.

The ALJ also reviewed and gave substantial weight to Felden's reports.  Tr. 89.  Felden was one of Wagoner's treating physicians responsible for  pain management.  Tr. 455-477, 559-

566, 610, 637-638, 609-612. The ALJ noted and considered relevant the fact that Felden's reports show that he was encouraging Wagoner to remain active and that, during a 2007 visit, Felden advised Wagoner to increase his activity because, although his pain may be exacerbated following activity, it would help him build up his endurance and diminish his pain with time. Tr. 564. Additionally, the ALJ referenced numerous instances of reports by Felden and Soni where straight leg raising examinations were negative.[15] Tr. 86-87. The ALJ acknowledged that Wagoner ambulated with a cane at times and testified that his pain management providers had recommend that he use a cane but noted that there was no other evidence showing a medical recommendation to use a cane. Tr. 87.

The ALJ also considered a 2006 report from chiropractor John Pinghero (Tr. 395) and a 2007 report of state agency reviewing physician Anton Freihofner (Tr. 435-442), both of which included opinions that Wagoner could perform light work. Tr. 90. However, because of Brahms' expertise in orthopedics, the ALJ gave greater weight to Brahms' opinion than to Pinghero's opinion. Tr. 90. The ALJ also gave minimal weight to Freihofner's opinion because the ALJ determined that the evidence demonstrates a greater level of residual functional capacity than light work. Tr. 90.

As indicated herein, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Here, the ALJ's RFC finding of reduced medium work is supported by substantial evidence and to reweigh the evidence including the medical opinions or decide questions of credibility is not appropriate.

---

[15] The ALJ did also reference some reports of positive straight leg raise. Tr. 86-87.

**C.     The ALJ's determination that Wagoner could perform his past relevant work as a security manager and EMT is proper and supported by substantial evidence.**

Wagoner argues that the ALJ erred at Step Four.[16]  Doc. 14 at 19.  "[A] claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:

1.  The actual functional demands and job duties of a particular past relevant job; or

2.  The functional demands and job duties of the occupation as generally required by employers throughout the national economy."

SSR No. 82-61, 1982 SSR LEXIS 31, * 4 (1982); *See also Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987)(stating that a claimant must show not just the inability to return to his former job but the inability to return to his former type of work).  To determine whether a claimant can return to his past relevant work, an ALJ may rely on the services of a vocational expert as well as other resources such as the Dictionary of Occupational Titles.  20 C.F.R. § 404.1560(b)(2).

Here, the ALJ did elicit and rely upon VE testimony to reach her determination that Wagoner can return to his past relevant work and therefore is not disabled.  Tr. 55-68, 92.  The ALJ agreed with the VE that, with a medium work RFC, Wagoner could not perform his past work as an EMT as he had performed it but could perform the position as it is performed in the national economy.  Tr. 92.  Additionally, the ALJ determined that Wagoner could perform his past work as a manger, internal security as that position is generally performed.  Tr. 92.

The ALJ alternatively found at Step Five that there were other jobs existing in the national economy that Wagoner could perform based on the established RFC, specifically, linen room attendant, dining room attendant, and cleaner II. Tr. 92-93.  Accordingly, even if the ALJ's

---

[16] Wagoner's argument in this regard is based in part on the weight given to Barnes' opinion.  Doc. 14 at 19.  The arguments pertaining to the weight given to Barnes' opinion are discussed *infra*.

determination at Step Four were determined to be incorrect, the ALJ's alternative analysis under Step Five supports a finding of "not disabled."

### V.  Conclusion and Recommendation

For the foregoing reasons, it is the undersigned's recommendation that the Commissioner's decision be AFFIRMED.

Dated: February 17, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).